UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>EUFEMIA ALAMO RAMIREZ | Case No. 06mg0706-POR<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

This matter having come before this Court pursuant to Title 18 United States Code, Section 3181, et. seq., for a hearing at the request of the Republic of Mexico for the extradition of Eufemia Alamo Ramirez, and this Court having held an extradition hearing on September 5, 2006, and having considered the evidence received at the hearing along with the arguments of counsel and the papers submitted prior to the hearing, this Court hereby affirms its oral ruling of September 5, 2006, that Eufemia Alamo Ramirez is extraditable under the extradition treaty between the United States of America and the Republic of Mexico, Treaty 31 U.S.T. 5059, TIAS 9656 ("Treaty").  This Court also makes the following findings of fact and conclusions of law.

### I.

### BACKGROUND OF THE CASE

On April 14, 2006, the United States Attorney's Office for the Southern District of California, acting on behalf of the Republic of Mexico, presented a complaint for provisional arrest to this Court. The complaint requested that the Court issue a warrant for the arrest of Ramirez with a view toward extradition. The United States Attorney's Office presented the complaint against

1  Ramirez pursuant to the extradition treaty between Mexico and the United States.

2  The complaint charged Ramirez with "transporting one or several undocumented foreigners
3  through national territory, with purpose of smuggling, hiding them to avoid inspection by
4  immigration authorities" in violation of Article 138 of the Mexican Federal Criminal Code.
5  According to the complaint, Ramirez assisted four foreigners, of Philippine origin, to enter Mexican
6  territory with the objective of reaching the United States.

7  Ramirez was arrested pursuant to an arrest warrant issued in the Central District of California
8  on February 24, 2006, which was based on the same request for provisional arrest as was presented
9  to this Court. Because Ramirez was arrested in the Southern District of California, the United States
10 chose to pursue the extradition before this Court and dismissed the complaint in the Central District
11 of California. Ramirez was ordered detained following a hearing on May 25, 2006.

12 On June 28, 2006, the United States Attorney's Office filed an official extradition request,
13 along with certified documents in support of the extradition request. The certified documents
14 include Diplomatic Note No. 04266 from the Embassy of Mexico, dated June 9, 2006, formally
15 requesting the extradition of Ramirez. The filing of certified documents permitted Mexico to go
16 forward with extradition proceedings under the Treaty. This Court held an extradition hearing on
17 September 5, 2006.

18 **II.**

19 **GENERAL PRINCIPLES REGARDING EXTRADITION HEARINGS**

20 The sole purpose of an extradition hearing, held pursuant to 18 U.S.C. § 3184 (and the
21 applicable Extradition Treaty), is to determine whether or not the individual who has been arrested
22 in the United States pursuant to a complaint filed on behalf of a foreign government is subject to
23 surrender to the requesting country. The substantive right of a foreign country to request the return
24 of a fugitive and the duty of the United States to deliver the fugitive depends entirely on the
25 existence of a treaty between the requesting nation and the United States. 18 U.S.C. § 3181, Factor
26 v. Laubenheimer, 290 U.S. 276 (1933). To invoke its right to extradite a fugitive, the requesting
27 nation must submit its request to a state or federal court. 18 U.S.C. § 3184. The court determines
28 whether the fugitive is subject to extradition, and, if so, must order the fugitive's commitment and

certify the supporting record to the Secretary of State. Id. The Secretary of State bears the responsibility for deciding whether surrender will ultimately occur. 18 U.S.C. § 3186; Escobedo v. United States, 623 F.2d 1098, 1105 n.20 (5th Cir.), cert. denied, 449 U.S. 1036 (1980). The fugitive cannot obtain direct appellate review of either the extraditing court's decision, Collins v. Miller, 252 U.S. 364, 369 (1920); Gusikoff v. United States, 620 F.2d 459, 461 (5th Cir. 1980), or the Secretary of State's exercise of discretion. Escobedo, 623 F.2d at 1105. The fugitive may obtain habeas corpus relief on the grounds of lack of probable cause, failure to prove identity, or failure to charge an offense within the meaning of the treaty. Gusikoff, 620 F.2d at 461.

The Government must prove several elements before Ramirez may be found extraditable by this Court. These elements roughly fall into six categories: (1) that the Court has jurisdiction to decide the question of extradition; (2) that a treaty of extradition exists between the United States and the Republic of Mexico and that the crimes with which Ramirez has been charged are covered by that treaty; (3) that Ramirez has been charged with such offenses in the requesting country; (4) that the offenses with which Ramirez is charged in the Republic of Mexico are also offenses in the United States (dual criminality); (5) that Ramirez is the same individual charged with the offenses by the requesting party (identity); and (6) that there is some evidence warranting the finding that there is reasonable ground to believe Ramirez is guilty (probable cause). Caplan v. Vokes, 649 F.2d 1336 (9th Cir. 1981); Fernandez v. Phillips, 268 U.S. 311 (1925).

In short, the paramount principle of every extradition proceeding is to determine whether probable cause exists to believe the person whose surrender is sought has committed the crime of which her extradition is requested. Collins v. Loisel, 259 U.S. 309, 315 (1922); Gusikoff, 620 F.2d at 462.

### III.

### SUMMARY OF FACTS UNDERLYING ALLEGED OFFENSE[1]

The Republic of Mexico seeks to extradite Ramirez on the charge of human trafficking. It is alleged that Ramirez assisted four foreigners, of Philippine origin, to enter Mexico via Guatemala

---

[1] The facts summarized below were taken from the statements of Eufemia Alamo Ramirez, Agnes Lalie Bandong, Neptali Jr. Tagaro Bulahan, Florisa Benitez Palileo, and Marie Millcente Bautista Madlangsakay. (Exhibit 2, Exhibit 4.)

1 without proper documentation with the intent of ultimately reaching the United States. The
2 statements of the four foreigners, identified as Agnes Lalie Bandong, Neptali Jr. Tagaro Bulahan,
3 Florisa Benitez Palileo, and Marie Millcente Bautista Madlangsakay ("foreigners"), indicate that
4 they paid Ramirez for assistance with passage to the United States.

5 Neptali Jr. Tagaro Bulahan and Agnes Lalie Bandong flew together from the Philippines to
6 Guatemala on February 4, 1998. (Exhibit 4, Statement of Bulahan.) While in Guatemala, they
7 stayed at three different hotels. At the second hotel, Bulahan and Bandong met Florisa Benitez
8 Palileo and Marie Millcente Bautista Madlangsakay, who also arrived in Guatemala on February 4,
9 1998. The foreigners contacted Ramirez by telephone and requested visas for the United States and
10 Mexico. According to the statements of the foreigners, Ramirez telephoned Cid Baena, who
11 telephoned Jose Armenta, who then telephoned Ivan Burgos in Guatemala. Ivan Burgos met them at
12 a hotel and indicated that he could help them get the visas for two thousand dollars each. The
13 foreigners turned over their passports to Ivan Burgos and some days later paid the requested amount
14 of money. Subsequently, their passports were delivered with Mexican and American visas, as well
15 as necessary immigration forms. Around March 25, 1998, two acquaintances of Ivan Burgos led the
16 foreigners to the Guatemala-Mexico border, where they crossed through a river to Mexican territory
17 by raft. The foreigners were then led to a guesthouse in Tapachula, Chiapas. Upon arriving in
18 Mexico, the foreigners were told that they were in the country illegally and that their movement
19 should be limited. At this point, the foreigners re-contacted Ramirez for assistance. Ramirez then
20 flew from the United States to Mexico. Once she arrived, the foreigners gave Ramirez their
21 passports.

22 Ramirez went to the Ciudad Hidalgo border to seal the passports, but the seals were denied
23 by an immigration officer. Ramirez then traveled to Mexico City in an effort to obtain proper
24 passport seals. While in Mexico City, Ramirez gave the passports to a lawyer to have them sealed.
25 Ramirez then returned to the United States. Subsequently, Jose Armenta returned the "sealed"
26 passports to the foreigners in Tapachula. Armenta also tried to obtain airline tickets for the
27 foreigners, but the tickets were sold out. At this point Armenta left, and Ramirez returned to Mexico
28 from the United States. Ramirez attempted to book tickets for the foreigners to fly to Mexico City,

1  but there were no available seats.  Thus, Ramirez and the foreigners decided to take a bus to Tuxtla,
2  from which they planned to fly to Mexico City.

3  On the way to Tuxtla, Ramirez and the foreigners were stopped by immigration authorities.
4  The foreigners presented their visas and it was discovered that they were false.  The immigration
5  authorities noticed irregularities, including: (1) the text showed signs of tampering, (2) the ink was
6  the wrong color, (3) the immigration documents indicated that they were issued in Guatemala, but
7  bore a seal from the Mexico City airport, which the foreigners indicated they had never visited, and
8  (4) the required signatures were missing.  (Exhibit 3.)  Ramirez and the foreigners were placed under
9  arrest for possessing falsified documents.

10  According to the preliminary investigation and arrest warrant issued in Tapachula, Chiapas,
11  Luis Manuel Martinez Perez, an immigration officer assigned to the International Airport of Mexico
12  City, made a statement before the Federal Public Prosecutor in Mexico City.  Perez declared that he
13  did not seal the documents presented by the foreigners and that he was not presented with the
14  documents to seal by Ramirez or any other person.  Further, Perez stated that his seal was stolen and
15  that this fact was reported to the Airport Public Prosecutor.  (Exhibit 6, Exhibit 7.)

## IV.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

18  After consideration of the documentary evidence and oral argument, this Court finds that the
19  government of Mexico, as represented by the United States Department of Justice, has established
20  that:

21  1.  The documents submitted in support of Mexico's extradition request are in proper
22  form and properly authenticated.  Section 6(b) of Article 10 of the Extradition Treaty and 18 U.S.C.
23  § 3190 require that the documents submitted by Mexico be received into evidence if the principal
24  consular officer of the United States has certified the authentication of the documents.  The
25  documents were certified on June 6, 2006, by David T. Donohue, Minister Counselor for Consular
26  Affairs, for the United States, in accordance with 18 U.S.C. § 3190.  At the time the documents were
27  certified, Mr. Donohue was the principal consular officer of the United States in Mexico.  Thus, the
28  authenticated documents were properly received into evidence.

1  2.  This Court has jurisdiction to determine the question of extradition. 18 U.S.C. § 3184. This Court also has jurisdiction over Ramirez, who is in custody, before this Court, and was found in the Southern District of California. Ramirez does not challenge the authority of this Court to conduct her extradition hearing.

3.  There is a valid extradition treaty in force and effect between the United States and the Republic of Mexico. The Treaty was signed on May 4, 1978, and went into effect on January 25, 1980. 31 U.S.T. 5059. Andrew Keller, Attorney Adviser, Office of the Legal Adviser, Department of State, United States of America, provided a declaration attesting that the Extradition Treaty is in full force and effect between the United States and Mexico. This declaration was properly sealed by the Secretary of State, Condoleezza Rice. Additionally, Ramirez does not dispute the fact that there is a valid treaty in force and effect between the United States and Mexico.

4.  The crimes charged against Ramirez are covered by the Treaty. Although not specifically enumerated in Appendix to the Treaty, the crimes charged are covered by Article 2, section 3, which provides: "Extradition shall also be granted for wilful acts which, although not being included in the Appendix, are punishable, in accordance with the federal laws of both contracting parties, by deprivation of liberty the maximum of which shall not be less than one year."

As Attorney Advisor Andrew Keller states in his declaration, "the acts for which extradition is sought are punishable in accordance with the laws of both contracting parties by deprivation of liberty for a period of at least one year, and are covered under Article 2 of the Treaty." Here, Ramirez was charged with human trafficking in violation of Article 138 of the Mexican Federal Criminal Code. Article 138 provides in pertinent part: "[There shall be imposed an imprisonment penalty from six to twelve years] on whomever or by means of a third party enters, without the corresponding documentation issued by the jurisdictional authority, one or several foreigners into Mexican territory or, for the purpose of trafficking, lodges or transports them within Mexican territory, so as to conceal them in order to avoid immigration inspection." In the United States, the facts alleged would constitute the offense of transportation of illegal aliens in violation of 8 U.S.C. § 1324, the maximum penalty for which exceeds one year. Further, Ramirez does not dispute that the crime charged is covered by the Treaty.

1    5.   There are criminal charges pending against Ramirez in Mexico. The arrest warrant issued in Mexico on December 30, 1999, charges Ramirez with "transporting one or several undocumented foreigners through national territory with the purpose of smuggling, hiding them to avoid inspection by immigration authorities." Ramirez does not dispute that there are charges pending against her in Mexico for the offense for which extradition is sought.

6.   The offenses with which Ramirez is charged in the Republic of Mexico are also offenses in the United States (dual criminality). Article 2 of the Treaty provides in pertinent part: "Extradition shall take place, subject to this Treaty, for wilful acts which . . . are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." In accordance with Article 2, the Court will consider "criminal provisions in federal law, or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of the states." Cucuzzella v. N. Kelikoa, 638 F.2d 105, 107 (9th Cir. 1981). The Supreme Court explained the dual criminality requirement in Collins v. Loisel, 259 U.S. 309, 312 (1922):

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions.

Citing Collins, some courts have held that the dual criminality doctrine requires only that the act alleged to have been committed constitute a crime in both countries. In Bozilov v. Siefert, 983 F.2d 140 (9th Cir. 1992), the Court of Appeals for the Ninth Circuit further explained this concept:

> "Dual criminality does not require that an offense in a foreign country have an identical counterpart under the laws of the United States." Dual criminality requires only that the acts alleged constitute a crime in both jurisdictions. Each state may name and penalize the crime differently.

Id. at 142 (citations omitted) (quoting in part, Theron v. United States Marshal, 832 F.2d 492, 496 (9th Cir. 1987), cert. denied, 486 U.S. 1059, (1988)). In other words, the Ninth Circuit stated that the elements of the alleged offense need not be identical as long as the same conduct constitutes a crime in both countries. Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1404-05 (9th Cir. 1988), cert. denied, 490 U.S. 1106 (1989).

As stated above in Paragraph 4, the facts alleged constitute the offense of transportation of illegal aliens in the United States under 8 U.S.C. § 1324.  Although the offenses are not identically phrased in the United States and Mexico, the crime of transportation of illegal aliens is substantially analogous to the crime of human trafficking under Article 138 of the Mexican Criminal Code, set forth above.  Additionally, the crimes charged are punishable by more than one year imprisonment in both the requesting and requested nations.  Accordingly, the requirement of dual criminality under the Treaty is satisfied.

7.     The Eufemia Alamo Ramirez named in the request for extradition and the person brought before this Court on the complaint for extradition, are one and the same person.  Ramirez does not dispute that she is the person charged with the offenses by the requesting party.  Thus, her identity is not at issue.

## V.

## **PROBABLE CAUSE**

Finally, this Court must determine whether there is some evidence warranting a finding that there is reasonable ground to believe that Ramirez is guilty of committing the crimes for which she is charged.

The issue of probable cause in extradition hearings is defined in accordance with the federal law and has been described as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."  Coleman v. Burnett, 477 F.2d 1187 (D.C. 1973); see Sidona v. Grant, 619 F.2d 167 (2nd Cir. 1980); Greci v. Birknes, 527 F.2d 956, 959 (1st Cir. 1976).

Applying this standard to the evidence presented by Mexico, a showing of probable cause has been made with respect to the criminal charges for which extradition is sought.

The crime charged involves the following elements: (1) The suspect transferring from one geographic place to another, within national territory, one or several foreigners with no identity papers; (2) the conduct being carried out with no authorization from the corresponding authority; and (3) the transport being carried out with traffic purposes, hiding the foreigners to avoid immigration inspection.  (Exhibit 7.)  There is sufficient evidence before this Court to entertain a

reasonable belief that Ramirez committed the charged offense. The following evidence presented to this Court supports each element of the offense:

///

1. <u>The suspect transferring from one geographic place to another, within national territory, one or several foreigners with no identity papers</u>:
   a) The statements of each of the four foreigners, Agnes Lalie Bandong, Neptali Jr. Tagaro Bulahan, Florisa Benitez Palileo, and Marie Millcente Bautista Madlangsakay, state that Ramirez assisted them in purchasing bus tickets in order to travel to Mexico City by land. (Exhibit 2, Exhibit 4.)
   b) In Ramirez's own statement, she indicates that when the foreigners first showed her their passports upon her arrival in Mexico, she realized that they had American and Mexican visas, but that they did not have the required seal of entrance into Mexico. (Exhibit 5.)
   c) The statements of the foreigners indicate that they paid Ramirez for assistance with passage through Mexico. (Exhibit 4.)
   d) Upon her arrival in Mexico, Ramirez collected the foreigners' passports and attempted to obtain passport seals at the Ciudad Hidalgo border, but an immigration officer denied the seal. (Exhibit 2.)
   e) Ramirez states that she intended to transport the foreigners from Tapachula to Mexico City and later to the United States. (Exhibit 2.)
   f) Ramirez's statement indicates that she knew the foreigners entered Mexico without the required documentation. (Exhibit 2.)
2. <u>The conduct being carried out with no authorization from the corresponding authority</u>:
   a) Upon her arrival in Mexico, Ramirez collected the foreigners' passports and attempted to obtain passport seals at the Ciudad Hidalgo border, but an immigration officer denied the seal. (Exhibit 2.)
   b) Immigration Officers Guillermo Garrido Ramirez, Daniel Mora Maldonado,

|   |   |   |
|---|---|---|
| 1 | | and Ventura de Jesus Camacho Robledo stated that when checking the |
| 2 | | documents of the four foreigners it was discovered that the American and |
| 3 | | Mexican visas were false.  The following irregularities were identified: (1) the |
| 4 | | ink color was wrong, (2) the text showed signs of tampering, (3) the |
| 5 | | documents were allegedly issued in Guatemala, but had a seal of entrance |
| 6 | | from the Mexico City airport, and (4) the documents were not signed by the |
| 7 | | officer allowing entrance. (Exhibit 3.) |
| 8 | c) | Although the foreigners' documents had seals of entrance for Mexico City, |
| 9 | | they stated that they had never been in Mexico City.  (Exhibit 3.) |
| 10 | d) | According to the preliminary investigation and arrest warrant issued in |
| 11 | | Tapachula, Chiapas, Luis Manuel Martinez Perez, an immigration officer |
| 12 | | assigned to the International Airport of Mexico City, made a statement before |
| 13 | | the Federal Public Prosecutor in Mexico City, in which he declared that he did |
| 14 | | not seal the documents presented by the foreigners and that he was not |
| 15 | | presented with the documents to seal by Ramirez or any other person. |
| 16 | | Further, Perez stated that his seal was stolen and that this fact was reported to |
| 17 | | the Airport Public Prosecutor.  (Exhibit 6, Exhibit 7.) |

3. <u>The transport being carried out with traffic purposes, hiding the foreigners to avoid immigration inspection</u>:

   a) According to the statements of the foreigners, they telephoned Ramirez from Guatemala in order to get her assistance in getting visas for Mexico and the United States.  Ramirez telephoned Cid Baena, who then telephoned Jose Armenta, who then telephoned Ivan Burgos.  Burgos contacted the foreigners and told them that he could get them visas for two thousand dollars each.  After this elaborate chain of contacts, two of Burgos's friends helped the foreigners cross a river into Mexico with the aid of rafts.  The foreigners were dropped at a guesthouse and told not to leave because they were in the country illegally.  (Exhibit 2, Exhibit 4.)

1          b)      The foreigners' immigration documents were clearly falsified to deceive immigration authorities. The documents had several obvious irregularities, including the wrong ink color, text that showed signs of tampering, indication that they were issued in Guatemala, yet bearing a seal from Mexico City, and lack of a signature of the officer allowing entrance. (Exhibit 3.)

## VI.

## CONCLUSION

This Court has jurisdiction to hear this extradition matter and has jurisdiction over Ramirez. Ramirez is the person sought by Mexico in this extradition proceeding. Probable cause exists to believe that Ramirez committed the offense of human trafficking in violation of Article 138 of the Mexican Federal Criminal Code. The offense charged is an extraditable offense under the valid extradition treaty between Mexico and the United States. The offense is punishable under the laws of both the United States and Mexico. Therefore, the Court GRANTS the request for extradition with respect to the charged offense.

The extradition request and the supporting documents admitted into evidence during the hearing are properly certified and authenticated or otherwise admissible within the discretion of the Court.

Accordingly, the Court will certify the above findings, and all documents admitted into evidence, to the Secretary of State, pursuant to 18 U.S.C. § 3184.

This order shall be stayed for a period of thirty (30) days from the date this order is stamped "filed", in order to permit Ramirez to file a petition for writ of habeas corpus in accordance with her request to the Court. At the conclusion of the thirty-day stay, if a habeas petition has not been filed, the Department of Justice shall prepare a certification and order of commitment consistent with this memorandum as required by 18 U.S.C. § 3184.

**IT IS SO ORDERED**.

DATED: September 12, 2006

                                                     LOUISA S PORTER
                                                   United States Magistrate Judge

cc:      All parties